*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

MOHAMMED JANEY ALAM,

   Defendant-Appellant.

UNPUBLISHED
October 15, 2019

No. 344519
Oakland Circuit Court
LC No. 2017-261660-FH

Before: FORT HOOD, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his conviction, after a jury trial, of one count of third-degree criminal sexual conduct (multiple variables), MCL 750.520d (CSC-III). The jury found defendant not guilty of two additional counts of CSC-III arising from the same incident. The trial court sentenced defendant to 40 months to 15 years' imprisonment. We affirm defendant's conviction. But because the trial court relied on acquitted conduct to score offense variable (OV) 13, MCL 777.43, and this constitutional error affected defendant's recommended minimum sentence range under the sentencing guidelines, we remand for resentencing.

## I. FACTS

Defendant, who managed a restaurant where the victim worked, took the victim out after work to celebrate defendant's bonus check. They were accompanied by one of defendant's friends, Erwin Kelley, and defendant's girlfriend, Krishelle June. June and the victim were roommates. The four spent several hours together in defendant's car. Defendant drove, and all four shared bottles of liquor. After driving for several hours, the four ended up back at the victim's apartment, and ultimately, defendant and the victim ended up alone in defendant's car.

At trial, the victim explained how, after taking a few sips from the liquor bottle she was sharing with defendant, she passed out in the passenger seat. She awoke first to find defendant penetrating her vagina with his fingers and performing cunnilingus. She fell back asleep and believed she was dreaming. But she then awoke to find defendant on top of her. He forced his penis inside her vagina. The victim told defendant to stop and struggled to escape, but defendant

-1-

would not relent. He pulled the victim down and told her to relax. After first telling the victim that he would not ejaculate inside her, defendant then said, "you're so stupid. . . . I already came inside you." After the assault, defendant tried to convince the victim that he had just woken up himself to find the victim having sex with Kelley. He told her not to go to police because he had a camera in the car that captured everything. Defendant also told the victim to "be careful who you drink with." The victim managed to escape the car and obtain help from neighbors, who took her to the hospital.

As will be discussed later in this opinion, in the hours and days after the assault, defendant made a number of false and conflicting statements to others, including to the investigating officer, Detective Ryan Malloy. He first tried to convince others that the victim had sex with Kelley. He went so far as to send text messages to June trying to convince her that Kelley was responsible. When one lie was proven false, defendant came up with another. But eventually, defendant's stories broke down, and he admitted to Detective Molloy that he had nonconsensual sex with the victim.

Defendant was charged with three counts of CSC-III. All alleged that defendant assaulted the victim either by force or coercion or while he knew or had reason to know that she was physically helpless. Count I was for the act of digital penetration, Count II was for the act of cunnilingus, and Count III was for the act of penile-vaginal penetration. At trial, defendant testified and admitted to making a wide variety of false statements to a number of people. He gave yet another version of events, in which he now claimed that the victim asked him to have sex, and that he confirmed that she wanted to have sex before commencing the act. The jury found defendant guilty of Count III, but not guilty of Counts I and II. He was sentenced as stated at the outset of this opinion, and now appeals as of right.

## II. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support his conviction. He explains that the key issue at trial was consent. As stated in his brief, defendant "asks, given the totality of the evidence presented during his trial, what credible and reliable evidence supported the jury's finding beyond a reasonable doubt that the sexual intercourse . . . was not consensual . . . ?" We conclude that sufficient evidence of defendant's guilt was presented at trial.

When presented with a challenge to the sufficiency of the evidence, this Court asks whether the evidence, viewed in a light most favorable to the prosecutor, would allow a reasonable juror to find the defendant guilty of the offense beyond a reasonable doubt. *People v Carll*, 322 Mich App 690, 696; 915 NW2d 387 (2018). All reasonable inferences must be drawn in favor of the prosecution, as must all credibility choices. *Id*. "Questions regarding the weight of the evidence and credibility of witnesses are for the jury, and this Court must not interfere with that role even when reviewing the sufficiency of the evidence." *Id*. All conflicts in the evidence must be resolved in favor of the prosecution. *Id*.

Defendant was convicted of one count of CSC-III, in violation of MCL 750.520d, for the act of penile-vaginal penetration that he now admits occurred. Pursuant to MCL 750.520d(1):

> (1) A person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and if any of the following circumstances exist:

> * * *

> (b) Force or coercion is used to accomplish the sexual penetration. . . .

> (c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

Defendant was charged under two theories, which were that he used force or coercion to accomplish the penetration, MCL 750.520d(1)(b), or that he knew or had reason to know that the victim "was mentally incapable, mentally incapacitated, or physically helpless," MCL 750.520d(1)(c). To sustain a conviction under MCL 750.520d(1)(b), the "required elements are: (1) defendant engaged in sexual penetration with the victim, and (2) force or coercion is used to accomplish the sexual penetration." *People v Eisen*, 296 Mich App 326, 332-333; 820 NW2d 229 (2012) (quotation marks, brackets, and citation omitted). "Force or coercion" is defined by MCL 750.520b(1)(f), and includes "the actual application of physical force or physical violence." MCL 750.520b(1)(f)(*i*). "The existence of force or coercion is to be determined in light of all the circumstances, and includes, but is not limited to, acts of physical force or violence . . . ." *Eisen*, 296 Mich App at 333 (quotation marks and citation omitted). The "prohibited 'force' encompasses the use of force against a victim to either induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment of sexual penetration without regard to the victim's wishes." *People v Carlson*, 466 Mich 130, 140; 644 NW2d 704 (2002).

A defendant is guilty of a violation of MCL 750.520d(1)(c) if he sexually penetrates the victim while the defendant knows or has reason to know that the victim is "physically helpless." A person is "physically helpless" if he or she is "unconscious, asleep, or for any other reason is unable to communicate unwillingness to an act." MCL 750.520a(m). "The essence of physical helplessness is that the victim is unable to communicate unwillingness to an act." *People v Perry*, 172 Mich App 609, 622; 432 NW2d 377 (1988). Thus, where the theory is that sexual penetration occurred while the victim was asleep, the evidence must show that penetration occurred while the victim was asleep or unconscious, not that the victim was awakened and then penetrated. *Id*.

The prosecutor presented sufficient evidence to show that defendant sexually penetrated the victim through the use of force or coercion. The victim gave detailed testimony explaining how defendant forced himself on her and engaged in intercourse against her will. Despite the victim's pleas that he stop and her attempts to escape, defendant held her down and continued the assault. The victim's testimony alone would be sufficient to uphold defendant's conviction, as it clearly established that defendant sexually assaulted the victim through the use of force.

-3-

See *People v DeLeon*, 317 Mich App 714, 719; 895 NW2d 577 (2016) (in a sexual assault case, "[t]he victim's testimony alone can provide sufficient evidence to support a conviction.")

But there was also evidence corroborating her testimony. The "finger swipes" on the window is a sign of a struggle, and the victim specifically testified that she touched the window while struggling to get away from defendant. And in the hours after the assault, the victim explained the incident multiple times and was consistent. Her demeanor was clearly consistent with someone who had been sexually assaulted, not someone who had engaged in consensual sex. She never wavered from her initial statement to defendant immediately after the assault, which was that he had raped her. And beyond that, in defendant's final interview with Detective Molloy, defendant admitted that he knew the victim did not want to have sex with him and that he took things too far. He apologized for his actions and admitted that they were wrong. While defendant did not specifically admit to using force to accomplish the penetration, this interview lends further support for the victim's testimony, and clearly contradicts defendant's trial testimony and current position on appeal, which is that the two had consensual sex.

There is also evidence sufficient to support a conviction under MCL 750.520d(1)(c). Defendant eventually admitted to Detective Molloy that the two engaged in sexual intercourse and other acts. Defendant acknowledged at the interview that he knew the victim did not want to have sex with him, and agreed that the victim was asleep when he began having sex with her, and that she then woke up and told him to stop. Defendant told Detective Molloy that, at this point, he realized what he was doing was wrong and that he went too far. Thus, defendant's own statement provides evidence that, at a minimum, he had reason to believe that the victim was asleep at the time he began having intercourse with her, and that the victim was asleep when he first began the assault.[1]

At trial and on appeal, defendant maintains that what occurred was consensual. But defendant's words and actions after the assault demonstrate his consciousness of guilt and lack of credibility. "A jury may infer consciousness of guilt from evidence of lying or deception." *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008). Immediately after the attack, defendant tried to convince the victim that she had sex with Kelley. He also tried to discourage

---

[1] While not necessary to support his conviction, there was also circumstantial evidence that defendant drugged the victim with Neurontin, which is labeled with a warning that it may cause drowsiness. The victim's testimony indicated that she drank earlier in the night, but was not overly intoxicated when she and defendant were alone in the car. But after taking a few sips from the bottle of liquor, she soon passed out. Defendant had an old prescription bottle of the drug in his car, which was found in a bag with the victim's keys. Defendant's explanation of why he still had the bottle nearly a decade after it expired was dubious. Defendant claimed that he kept the bottle around to store change, but no change was found in the bottle. Defendant tried to explain that by stating that he had recently gone to a store, where he turned the change into about $15 in cash. When asked how $15 in change could possibly have been in the bottle, defendant stated that the bottle contained all quarters. That explanation makes little, if any, sense.

her from going to police by claiming that his dashboard camera captured everything, even though that camera faced to the outside of the car. Defendant sent untruthful text messages to June implying that Kelley and the victim had been together. When first speaking to Detective Molloy, defendant gave a detailed explanation in which he maintained that he had never had sex with the victim. He indicated that the victim went home with Kelley, again trying to shift blame onto someone else. Defendant then tried to convince Kelley that he was a suspect. Taken in a light most favorable to the prosecutor, this evidence shows that defendant was deliberately trying to convince the victim and others that Kelley had sex with the victim in order to escape responsibility for his own criminal acts.

It is also worth noting that during his first conversation with Detective Molloy, defendant acknowledged that he believed the victim had been raped, as that was what he claimed he had been told by others. Even when told that his story did not make sense, defendant maintained that he never had sex with the victim at all. In a second conversation, defendant again claimed that he never had sex with the victim. Even when Detective Molloy explained that it would not have been illegal for defendant to have had consensual sex with the victim, defendant was adamant that the two never had sex. Defendant's repeated stance that he never had sex with the victim at all is evidence that he knew he had nonconsensual sex with her. Had defendant engaged only in consensual sex, one would expect that he would have said so from the beginning.[2]

Yet when interviewed at the police station days later, defendant again maintained, at least initially, that he did not have sex with the victim at all. It was only after being informed that the police had substantial evidence against him, and after being educated regarding DNA testing, that defendant acknowledged that he did, in fact, have sex with the victim. But even then, defendant gave irrational and conflicting explanations. First, he claimed that he could not remember digitally penetrating the victim or engaging in cunnilingus because after the two first engaged in physical contact, he "zoned out" and could not remember anything that happened after. But when Detective Molloy questioned defendant's honesty, defendant admitted that he did, in fact, remember digitally penetrating the victim. He also said that he thought he remembered performing cunnilingus. But defendant then claimed that everything began with the victim coming on to him, and that the encounter was consensual. However, by the end of the interview, defendant had admitted that he knew the victim did not want to have sex with him, that he had sex with her while she was unconscious, and that he "took it too far." His written statement, in which he apologized for what happened, seems to acknowledge that what occurred between him and the victim was not consensual.

Defendant then contradicted himself a final time at trial, claiming that the act was, in fact, consensual. For the first time, he claimed that the victim was the one to suggest that the two have sex, and that he verbally confirmed that she wanted to have sex with him. He also

---

[2] It is true that defendant explained that he lied in an effort to prevent June from finding out that he had sex with the victim. But it is equally true that Detective Molloy explained that he had no reason to discuss the matter with June. Regardless, defendant continued to maintain that he never had sex with the victim.

acknowledged that the victim told him to stop, but claimed it was only in relation to her request that he not ejaculate inside her. Had any of that been true, one would have expected defendant to make some mention of those facts earlier, or at least by the time he admitted to Detective Molloy that he had sex with the victim. It is fairly clear that defendant tried to lie about the incident to avoid responsibility. Each time he was faced with evidence refuting his false statements, he came up with a new lie, until his story finally unraveled. Defendant's ever-shifting, conflicting, and frequently nonsensical statements regarding the incident were damning evidence that he did, in fact, engage in nonconsensual sex with the victim.[3]

On appeal, defendant notes that the victim testified that she was drunk, but claims that whether the victim was drunk, "and its effect on her, was not answered clearly." He points out that no drugs or alcohol were found in her urine sample—which was taken at 11:30 a.m., almost six hours after the attack. Defendant also claims that other witnesses who testified that the victim was intoxicated had reason to slant their testimony. Defendant asks this Court to rely on that, and his own testimony that the two had consensual sex, to grant him relief.

Defendant's concerns about whether the victim had been drinking are baseless. There was ample testimony that she had been drinking, including defendant's own testimony. That a urine sample taken many hours after the attack found no alcohol or drugs does not prove that the victim was intoxicated. The only evidence supporting the theory that defendant and the victim had consensual sex is defendant's own testimony. But the jury clearly found that testimony to lack credibility, which is unsurprising in light of the evidence discussed above. And in any event, credibility concerns are for the jury, and not this Court, to decide. *Carll*, 322 Mich App at 696. On the whole, there is abundant evidence proving that the act of sexual intercourse was not consensual. Defendant's sufficiency argument lacks any conceivable merit.

## B. SENTENCING

At sentencing, the trial court assigned 25 points to OV 13 (continuing pattern of criminal behavior), MCL 777.43, on the basis that defendant had committed three criminal acts against a person. Those acts were the act of penile-vaginal penetration for which he stands convicted, and the other acts for which the jury found him not guilty. Defendant argues that the trial court's use of acquitted conduct at sentencing violates the Sixth Amendment. Under recent authority from our Supreme Court, the trial court is indeed prohibited from using acquitted conduct in this manner at sentencing. This error affects defendant's recommended minimum sentence range, and as such, we must remand for resentencing.

This Court reviews constitutional issues de novo. *People v Wiley*, 324 Mich App 130, 164; 919 NW2d 802 (2018).

Defendant was sentenced in October 2017. On July 29, 2019, our Supreme Court issued its decision in *People v Beck*, ___ Mich ___; ___ NW2d ___ (2019) (Docket No. 152934). In

---

[3] Further damaging defendant's credibility, and demonstrating his consciousness of guilt, is the fact that he tried to influence Kelley's testimony in the weeks before trial.

that opinion, the Court declared that if a defendant is acquitted of having committed a crime, "it violates due process to sentence the defendant as if he committed that very same crime." *Id*. at ___; slip op at 2. The Court explained:

> When a jury has made no findings (as with uncharged conduct, for example), no constitutional impediment prevents a sentencing court from punishing the defendant as if he engaged in that conduct using a preponderance-of-the-evidence standard. But when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent. To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself.
>
> Unlike . . . uncharged conduct . . . , conduct that is protected by the presumption of innocence may not be evaluated using the preponderance-of-the-evidence standard without violating due process. . . . While we recognize that our holding today represents a minority position, one final consideration informs our conclusion: the volume and fervor of judges and commentators who have criticized the practice of using acquitted conduct as inconsistent with fundamental fairness and common sense. . . .
>
> *  *  *
>
> This ends here. Unlike many of those judges and commentators, we do not believe existing United States Supreme Court jurisprudence prevents us from holding that reliance on acquitted conduct at sentencing is barred by the Fourteenth Amendment. We hold that it is. [*Id*. at ___; slip op at 18-21 (footnotes, quotation marks, and citations omitted).]

The Court's ultimate holding was that "due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *Id*. at ___; slip op at 22. In the present case, the trial court did precisely that which it is prohibited from doing by the decision in *Beck*.

*Beck* arose in the context of a trial court using acquitted conduct to support a departure from the sentencing guidelines. *Id*. at ___; slip op at 3-4. The present matter is slightly different in that acquitted conduct was used to score the offense variables, specifically, OV 13. But our Supreme Court's decision is based in the constitutionally protected presumption of innocence, and broadly proclaims that a trial court is prohibited from "finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *Id*. at ___; slip op at 22. Again, that is exactly what the trial court did in this case. As such, the decision in *Beck* is controlling of the issue here. The trial court's use of acquitted conduct to score defendant's offense variables violates due process. *Id*.

Resentencing is required. The trial court used defendant's one jury conviction and its own conclusion that the other two offenses occurred to find that three offenses against a person

occurred. That resulted in 25 points being assigned to OV 13 pursuant to MCL 777.43(1)(c). Without the two offenses that could not be scored in light of *Beck*, defendant should have been assigned no points for OV 13. MCL 777.43(1)(g). Defendant's total OV score was 65 points, placing him in OV Level V. MCL 777.63. A score of 40 points places defendant in OV Level IV. MCL 777.63. As such, resentencing is required. *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006).

We note that defendant's argument is raised specifically as a Sixth Amendment challenge. In *Beck*, the defendant did the same, arguing that "the trial court's reliance on conduct of which he was acquitted to increase his sentence violates his constitutional rights under the Sixth and Fourteenth Amendments . . . ." *Id*. at ___; slip op at 9. Despite beginning its analysis by describing the question as whether the "Sixth and Fourteenth Amendments permit the use of acquitted conduct to increase a defendant's sentence," *Beck*, ___ Mich at ___; slip op at 13, the Court declined to hold that the use of acquitted conduct at sentencing violates the Sixth Amendment, *id*. at ___; slip op at 11 n 10. Yet the Court nonetheless found a constitutional violation and reversed. *Id*. at ___; slip op at 21-22. Thus, as was done in *Beck*, even though the question has been presented as a Sixth Amendment issue, we are not constrained by the way the issue has been presented by defendant. It is plain that under our Supreme Court's most recent statement on this precise topic, the trial court could not use acquitted conduct to score the sentencing guidelines. *Id*.

Defendant's conviction is affirmed. The matter is remanded for resentencing in a manner consistent with this opinion. We do not retain jurisdiction.


/s/ Karen M. Fort Hood
/s/ David H. Sawyer
/s/ Douglas B. Shapiro